GLADNEY, Judge.
The petitioner, Union Producing Company, instituted this action on February 15, 1963 to secure a declaratory judgment under Articles 1871-1873, of the LSA-Code of Civil Procedure, to have adjudicated its rights and legal relationship with reference to a certain oil, gas and mineral lease granted by Mrs. M. E. Hill, et als. to Dan-ciger Oil and Refiining Company on February 12, 1924, affecting 380 acres of land in Union Parish, Louisiana, the petitioner having acquired said lease through mesne conveyance. Primarily, the petitioner seeks a decree declaring that it, as lessee, is not required to pay the defendants, as lessors, on or before March 1, 1963, a minimum amount of $750.00 for any of the ten gas wells then on the land and, annually thereafter, a minimum amount of $750.00 per well, as “royalty rental”, for any completed gas wells on said land. After issue was joined by answer of the defendants the petitioner filed a motion for summary judgment and in support thereof adduced a limited amount of evidence. This motion was not passed on by the trial court but referred to the merits. Judgment was rendered interpreting the provisions of the lease in controversy favorable to the defendants, lessors, from which decree plaintiff has appealed.
The subject lease was prepared by the late Carl McHenry of Monroe, an attorney experienced in oil and gas matters. Apparently he was chosen by both lessors and lessees for the task at hand. The instrument as drawn is not on a printed form but was typed out in full. It is skillfully con-fected and appears to protect with proper contractual reservations the rights of lessors and lessee with a full measure of fairness.
*507 The contract of lease recites an initial payment of $3800.00 and provided that if actual drilling was not commenced on or before March 1, 1925 the lease would terminate, but the lessee on or before said date could pay to lessors the sum of $1900.00, which sum would operate to extend the lease and keep the same in force until March 1, 1926. Then the lease contained the following stipulations with respect to the continuance of the lease through the payment of royalty rentals per well or drilling :
“That at the end of said two-year period, or on the 1st day of March, 1926, the within lease shall wholly terminate, unless the within Lessee has, on or before said date, March 1, 1926, commenced the drilling of a well on said leased premises, in search of oil or gas. Such well so commenced must be completed within four (4) months from said date — March 1, 1926 — otherwise, the within lease shall wholly terminate and expire.
“For the year beginning March 1, 1926, this Lessee shall pay to the Lessor, as a royalty rental, the sum of Seven Hundred Fifty Dollars ($750.00) for each gas well on said land, regardless of the amount of gas used or sold therefrom; but shall pay on the basis of one-eighth (1/6) of three cents per 1,000 cubic feet, as hereinabove set forth, in the event that the gas royalty exceeds the flat payment of Seven Hundred Fifty Dollars ($750.00) per well.
“In the event the within lease has been kept in force and effect, by the payment of the rentals hereinabove set forth, and by the drilling of a gas well, this Lessee shall pay for the fourth year; that is, March 1, 1927 to March 1, 1928, Seven Hundred Fifty Dollars ($750.00) per well, royalty rental, unless the gas used or sold from the premises shall exceed the sum of Seven Hundred Fifty Dollars ($750.00) at one-eighth (i/¿) of three cents, measured and computed as here-inabove set forth, in which latter event the royalty of one-eighth Q4) of three cents per 1,000 cubic fee, on a ten (10) ounce pressure basis above atmospheric pressure (14.4 pounds) shall be paid.
“If a second well in search of oil or gas be not commenced by this Lessee before the end of the fourth year, and completed within four months from the date of beginning, this lease shall terminate as to two-thirds (%) of the acreage; the Lessee having the right to select one-third (1/3) of the total acreage around the well already drilled on said land; said selection shall be made in a solid block, including the well drilled.
“In the event that two wells are drilled, as above set forth, the Lessee shall commence the drilling of the third well on or before the end of the fifth year, and the same shall be completed within four months from the date of beginning. Should the Lessee fail to so drill said third well, this lease shall be forfeited as to one-third (1/3) of the acreage hereinabove described; Lessee having the right to select two-thirds (%) of the total acreage around the two wells already drilled, according to this contract. The said selection by Lessee shall be in a solid block, including the two wells drilled, and the Lessee shall so select the acreage earned by said two wells within thirty (30) days from the date of the forfeiture of said one-third (1/6) of the acreage. In the event of the failure of the Lessee to designate the acreage earned by the wells, the Lessor shall designate the acreage earned by Lessee, and Lessor’s action in such selection shall be binding upon the Lessee.
“Th parties hereto agree that in the event of loss by accident of any well drilling under the above provisions, *508 the Lessee shall have an additional two months within which to drill a second well for oil or gas to take the place of the well so lost by accident.
“It is understood that regardless of the time of the completion of any well drilled under this contract, the minimum rental of Seven Hundred Fifty Dollars ($750.00) per well per year, as herein provided, shall be paid yearly in advance, and on the 1st day of March of each year.
“In the event the gas used or sold from the leased premises by the Lessee shall exceed, at one-eighth (14) of three cents per 1,000 cubic feet, the flat payments of Seven Hundred Fifty Dollars ($750.00) per well, the gas royalties at one-eighth (14) of three cents per 1,000 cubic feet shall be paid quarterly.
“The drilling by the Lessee of three commercial gas wells on the leased property shall fulfill the drilling requirements of this lease, except as the Lessee may be required to protect the within acreage by offset wells, and the lease in its entirety, shall remain in full force and effect so long as the acreage is producing gas or oil in paying quantities, provided that the Lessee promptly pays all rentals and royalties as due.”
Three producing gas wells were drilled on the three hundred eighty acres prior to March 1, 1929: the first well was drilled April 26, 1926, the second well was drilled March 17, 1928; and the third well was drilled March 27, 1929. No further or additional wells were drilled on the leased premises until the year 1962. During the period from 1929 through 1962 appellant recognized an obligation under the lease to pay, and in fact did pay, to the lessors annually $750.00 per well. On December 15, 1962, appellant subleased to D. J. Simmons the Hill lease and thereon seven additional producing wells were drilled. On February 13, 1963, appellant deposited the sum of $7,500.00 to the credit of the lessors with the advice:
“This check represents advance payment of ‘royalty rental’ at the rate of $750.00 per well for the above ten wells for the period from March 1, 1963, to-March 1, 1964, which the above named persons have demanded and claim is due to them under and pursuant to their interpretation of that certain lease dated February 12, 1924, recorded in Book 54, page 219, of the Conveyance Records of Union Parish, Louisiana.
“By a copy of this letter, which we are sending to each of the above named persons, these persons are hereby notified and informed that, in making such payment, Union Producing Company does not agree that said payment is due, does not agree with their interpretation of said lease, is not making such payment voluntarily and is making such payment because they have made such demands and for the sole and only purpose of preventing or avoiding a possible forfeiture of its said lease, in the event it should ultimately be determined that Union Producing Company is legally obligated to make such payment, or any part thereof, to them; and that, in making such payment, Union Producing Company hereby reserves its right to recover said payment, or any part thereof, from them, in the event it should ultimately be determined that it is not legally obligated to make such payment, or any part thereof, to them, and advises them that it will soon commence a court action to have the lease interpreted.”
The contentions of appellant as we understand them and substantially as set forth in its brief are :
“The primary question here is as to whether an obligation ever was created, *509 whether the contract provides for an obligation, not as to the meaning or interpretation of the obligation.”
“From this and from the lease as a whole it is clear that the parties contemplated and contracted with reference to three gas wells only.”
“This lease granted in 1924 just does not contain any stipulation imposing upon lessee the necessity of making minimum annual payments, excepting only— such payments for the third and fourth years only.”
The paragraph of the lease (hereinafter called “controversial paragraph”) reading:
“It is understood that regardless of the time of the completion of any well drilled under this contract, the minimum rental of $750.00 per well per year, as herein provided, shall be paid yearly in advance and on the first day of March each year”
as relied upon by the defendants and by the trial court “does not impose any obligation to make any payment and refers back to said two paragraphs for what payments are to be required.”
“Regardless of how your honors may hold as to said three wells, surely the action of plaintiff in making payments with reference to said three wells does not bind it as to the seven wells drilled in 1962, as to which payments have not been made except under protest.”
The argument of appellees may be summarized as follows:
That lessors are entitled to be paid a minimum royalty rental of $750.00 per well, per year on each completed gas well, and if the royalty on gas produced, figured at one-eighth of three cents per 1,000 cubic feet, exceeds the amount of such payments, they are to be paid the excess and that the lease definitely so provides, referring to the paragraph of the lease quoted in appellant’s contentions numbered [4], supra.
That lessor and lessee have so interpreted the contract by their performance without protest over the intervening years and appellant has acquiesced in the manner of performance by its ancestors in title and therefore cannot plead “acquisition on the face of the public records” to attack the contract.
In his reasons for judgment the very able trial judge explained in a scholarly and thorough manner his decision, saying:
“The Court has read and re-read the lease submitted to it for interpretation and has reviewed it along with its relationship to Articles 1945 through 1962 of the Revised Civil Code relating to the interpretation of contracts. It is noted that Article 1956 of the Revised Civil Code reads:
“ ‘When the intent of the parties is doubtful, the construction put upon it, by the manner in which it has been executed by both, or by one with the express or implied assent of the other, furnishes a rule for its interpretation.’
“And applying this article to the agreement involved, it is noted that the parties have apparently complied with the agreement, as written, from the time of its inception until 1962 and that during said period of time the lessee has paid to the lessor, as a royalty rental, a minimum of $750.00 per well for the three wells which had been completed on the property prior to 1962.
“It is also noted that Article 1957 of the Revised Civil Code provides:
“ ‘In a doubtful case, the agreement is interpreted against him who has contracted the obligation.’
Thus, if there is serious doubt as to whether or not the provisions of the lease require the payment of a minimum *510 of $750.00 royalty rental to the landowner on the newly completed wells, then, according to this Article, the doubt should be resolved against the lessee, for certainly the lessee has contracted the obligation, and it would have been most simple to have provided that the provisions for annual royalty rentals of $750.00 per well were to apply only to the first three wells drilled in accordance with the agreement, but no such statement is contained within the lease.
“Furthermore, it is well understood by this Court that parole evidence is not admissible to contradict or to vary the terms of a written instrument, hut such evidence is admissible to explain any ambiguous provisions contained therein and it was to this end that the Court opened the case for the reception of evidence. However, with the exception of the testimony of Mr. Browne, no explanatory evidence was offered and the Court finds it necessary to resort to the agreement itself to seek to determine the intent of the parties who were involved in the execution of the original agreement in 1924.
“It is apparent, from an examination of the agreement now before the Court, that the lease here involved is the result of an attempt by the landowners to protect themselves in at least two possibilities. One of these possibilities was the right of the lessee, ordinarily, to drill only one well and to hold the entire tract of three hundred eighty (380) acres by the drilling of one such well. Thus, the lessors sought to protect themselves against the underdevelopment of the property leased. Consequently, the lease contained the requirement of a minimum of at least three wells. The other continguency was the possibility that the lease would not be operated to a reasonable capacity, and that there would be a minimum amount of gas produced or pulled from any well drilled on the property. Thus, there was the effort to protect the lessors against small production, and the provisions for the minimum royalty payment of $750.00 per well per year were placed in the lease. Likewise, on the behalf of the lessee, there was the provision that, except for necessary offsets from wells drilled on adjoining land, the drilling of three wells on the three hundred eighty (380) acre tract would constitute full compliance with the contract, thereby protecting the lessee against having to pay more than $750.00 per well for three wells. This may have been of significant value to the lessee at the time of the execution of the lease, which was a time when natural gas was worth only three cents per thousand cubic feet measured at ten ounces above atmospheric pressure. It is not of such significance to the lessee at this time, since now natural gas has a market value of approximately four times the value fixed in the lease of 1924.
“Looking further at the provisions of the lease, we find an instrument whereby the owners of the property, leased this three hundred eighty (380) acre tract of land for the production of oil and gas to the lessee and stipulated that the landowner would be paid a stipulated royalty interest of one-eighth, of all of the oil produced and saved from the property, and that on gas produced therefrom the lessor would be paid one-eighth of three cents per thousand cubic feet, computed at ten ounces above atmospheric pressure. Likewise it provided that any gas obtained from producing oil in paying quantities, would likewise be paid for at the rate of one-eighth of three cents per thousand feet computed at ten ounces above atmospheric pressure.
“Thereafter, the lease contains provisions that unless a well is drilled on the property on or before the first anniversary date, the same could be renewed for the second year by the payment of *511 a delay rental of $1900.00, such payment to be made directly to the lessors or to be deposited to the lessors’ credit in the Ouachita National Bank at Monroe, Louisiana. Up to this point the lease could have been kept in force for a period of two years; the first year by virtue of the bonus payment of $3800.00 and the second year by a delay rental of $1900.00. Then begins the portion of the lease that brings on the controversy, as the lease stipulates that at the. end of the two-year period, or on the 1st of March, 1926, the lease will terminate unless on or before March 1st, 1926 the lessee has commenced the drilling of a well on the property in search of oil or gas, and it then provides:
“ ‘For the year beginning March 1, 1926, this Lessee shall pay to the Lessor, as a royalty rental, the sum of Seven Hundred Fifty Dollars ($750.00) for each gas well on said land, regardless of the amount of gas used or sold therefrom; but shall pay on the basis of one-eighth (¥&) of three cents per 1,000 cubic feet, as hereinabove set forth, in the event that the gas royalty exceeds the flat payment of Seven Hundred Fifty Dollars ($750.00) per well.’
Thus, it is seen, that the lease provides that for the third year, there must be at least one gas well previously drilled, otherwise the lease would terminate, and as a royalty payment upon production from this first well, there must be paid a royalty rental of $750.00, or the regular one-eighth production royalty payment, whichever of the two would be the greater. But note in the quoted portion, as above set out, that the quoted section provides for the payment of $750.00 for each gas well on said land, regardless of the amount of gas sold therefrom and concludes by providing for the payment of $750.00 per well. So, it must have been contemplated by the parties that when this provision was placed in the agreement, that the lessee who had obtained the lease in February of 1924 may have drilled prior to March 1st, 1926, any number of wells upon the leased property, otherwise, why would they have stipulated a royalty payment of $750.00 for ‘each gas well’ ? Thus, it seems to the Court that the parties contemplated that there may have been drilled numerous gas wells on the property and regardless of the number of gas wells so drilled, that for the year beginning March 1st, 1926 and ending March 1st, 1927, if there had been ten wells that the lessee would have been required to pay $750.00 for each gas well then in production.
“The lease goes on to make provision for the fourth year, and stipulates that in the event the lessee has drilled a gas well on the property prior to this fourth year, then they shall begin to drill the second, at least a second well, on or by March 1st, 1927 and that they would also pay a royalty rental for the second well that was required, as a minimum, to keep the lease in force from March 1st, 1927 to March 1st, 1928 of $750.00 ‘per well’. There follows the provision relating to the year which would have begun March 1st, 1928 and run to March 1st, 1929, referred to as the fifth year, and it stipulated, if the two wells above provided for are drilled, then, in order to keep the full lease in force for the fifty year, there must have been a third well drilled on the property beginning on or by the first of March and completed within four months, otherwise the lessee would lose one-third of the acreage.
“Then comes the provision of the lease which brings on the controversy in this case and I quote that provision from the lease itself:
“ ‘It is understood that regardless of the time of the completion of any *512 well drilled under this contract, the minimum rental of Seven Hundred Fifty Dollars ($750.00) per well per year, as herein provided, shall be paid yearly in advance, and on the 1st day of March of each year.’
■“It is the contention of the plaintiff that the above provision is dealing solely with the time of payment, and that the subject of this paragraph contained within the lease, is to fix the time of payment as being the first day of March of each year during the time for the drilling of this first three wells, as provided for in the agreement. On the other hand, it is the contention of the defendants that the subject of the paragraph is the minimum royalty rental of $750.00. In other words, the plaintiff is claiming that this provision provides solely for time of payment of the royalty provisions contained in the lease. The defendant, on the other hand, contends that the subject of the contract is the minimum royalty rental and they analyze the paragraph in question in the following way:
“I. The minimum rental is to be paid:
“(a) 'ON ANY WELL DRILLED UNDER THIS (LEASE) CONTRACT.’
"(b) This rental is to be paid, 'REGARDLESS OF THE TIME OF COMPLETION.’
“(c) This payment is to be ‘SEVEN HUNDRED FIFTY DOLLARS ($750.00) PER WELL PER YEAR.’
“(d) It is to be paid:
“(1) ‘IN ADVANCE’
“(2) ‘YEARLY’
“(3) ‘ON THE 1ST DAY OF MARCH OF EACH YEAR.’
“(4) AS HEREIN PROVIDED. * * * REGARDLESS OF THE AMOUNT OF GAS USED OR SOLD THEREFROM;
“(5) BUT, IF THE VALUE OF THE GAS USED OR SOLD FROM THE LEASED PREMISES, FIGURED ON A BASIS OF ONE-EIGHTH (i/áth) OF THREE CENTS PER 1,000 CUBIC FEET AND COMPUTED ON THE PRESSURE BASIS OF TEN OUNCES ABOVE ATMOSPHERIC PRESSIRE (14.4 POUNDS), EXCEEDS THE AGGREGATE FLAT PAYMENT OF SEVEN HUNDRED FIFTY DOLLARS ($750.00) PER WELL, THE LESSEE SHALL PAY THE EXCESS.
“After a full study of this matter and consideration of every argument involved in the case, it is the opinion of the Court that the paragraph here under consideration, in view of the other provisions of the lease, is dealing with the minimum royalty payment of $750.00 per well per year on any well that may be, at any time, drilled upon the property. As above stated, the $750.00 minimum royalty rental payment was intended as a guarantee to the landowners that every well drilled upon the property would produce for them a minimum royalty of not less than $750.00 per year. On the other hand, the lessee protected itself by stipulating that under such a condition it would fulfill its complete contract by drilling only three wells, even though the tract contained three hundred eighty (380) acres and the average acreage for a gas well in the Union Parish Gas Field is less than forty acres per well. By reading the stipulation contained in this lease, with reference to other parts, it seems to the Court that this provision was intended to cover all wells that might be drilled on the property at any time, and that the provision ‘as herein provided’ simply meant that the royalty and/or rentals were to be paid for each year be *513 ginning March 1st as long as production was had on the property, and that such payments would he paid yearly in advance, as had actually been provided for the regular rental or royalty in the first place.”
The interpretation of the so-called controversial paragraph by the judge a quo is in our opinion a correct one. To us the paragraph as written is clearly understandable. It is not restrictive in its application as counsel for appellant asserts, i. e., to the fixation of the time for payment of rental royalty as would accrue on the wells drilled prior to the end of the fourth year of the lease. The words "regardless of the time of the completion of any well drilled under this contract” is comprehensive and is indicative that the parties had in mind that the lessee might drill more than the three wells required to maintain the lease in its entirety, and such additional wells might be drilled prior to the end of the fourth year of the lease or thereafter at any time while the lease is being maintained. An argument advanced by appellant is that according to the lessor’s construction any payment per well is required to be made in advance, regardless of the time of the completion of any additional wells, which will put the lessee in the position of having to anticipate in advance and prior to March 1 of each year the extent of the drilling to be conducted during the ensuing yearly period in order to anticipate and pay in advance the $750.00 for each well. This contention seems to have but small, if any, merit. There are presently ten producing wells on the 380 acre lease which from the field history indicates the lease is fully, if not overdeveloped. A fortiori, the parties by mutually satisfactory agreements can avoid the delay in drilling other wells, for we find it difficult to believe the lessors would not facilitate drilling which had not been anticipated by the lessee prior to March 1, of any year.
For the reasons hereinabove set forth the judgment appealed from is affirmed at appellant’s costs.